M'BROOM and TURNER v. RIVES.

1. Where a plaintiff neglects to sue out his execution from term to term, an execution on a younger judgement delivered to the sheriff during such neglect, will acquire a preference.
2. A constructive fraud is an act which the law declares to be fraudulent, without inquiring into its motive. Not because arbitrary rules on the subject have been laid down, but because such an act carries in itself irresistible evidence of fraud.
3. A party who is secured by a deed of trust on property may, when a defect is discovered in the deed, receive a judgement by confession from his debtor, and by execution, sell the property. This is not a fraud on other creditors.

JUDGE TAYLOR delivered the opinion of the majority of the Court.

THE object of this case is to determine to whom Wm. M'Broom, late sheriff of Madison county, shall pay a sum of money made by a sale of the property of one Egbert Harris; which was levied on and sold by virtue of two executions, one in favor of said Simon Turner, and the other in favor of the said Francis E. Rives the amount of the money being insufficient to satisfy both. The case agreed is as follows, viz: "At the fall term, 1821, of the Madison Circuit Court, said Francis E. Rives, obtained a judgement against Egbert Harris, for the sum of $4200 debt, $2033 damages, and the costs of suit. On the 6th day of October, 1821, execution for the amount of the judgement was placed in the hands of the sheriff of said county, returnable to the next April term of said Court; and whilst said execution was in the hands of the sheriff, said Rives employed Messrs Kelly and Hutchinson as

counsel, viz: on the 9th day of February, 1822, to obtain for him the amount of his judgement against said Harris. That said Kelly and Hutchinson had been previously employed by Simon Turner to prosecute a suit in Chancery, then pending in said Circuit Court, on a deed of trust given by said Harris to said Turner and others, upon the same negroes which were finally sold under the execution of said Rives, and the execution of said Turner. That Harris was at the time greatly embarrassed, and had previous to making the deed of trust to Turner and others, conveyed said negroes to John N. S. Jones, which conveyance was not considered valid; and that Jones, or those claiming under him, were in possession of the negroes. That said execution in favor of Rives, was returned by the sheriff, without any direction from Rives, '*no property found*,' at said April term, 1822. That those in possession of said negroes under said Jones, had executions of prior date to said Rives', levied on said property, and advertised for sale, which sale was enjoined upon a supplemental bill, filed by said Turner in said suit, upon which he gave security. These occurrences took place before said Kelly and Hutchinson were employed by said Rives, and were known to the agent of said Rives. At that time, the said Kelly and Hutchinson considered the said deed of trust to Turner and others to be good, and to constitute a superior lien on said negroes to Rives' execution, and that opinion was communicated to said agent; but he was not otherwise informed of any intention on their part, to postpone the execution of said Rives to any other claim in their hands against said Harris, further than the law would give a preference. They considered their obligation to Turner paramount to that to Rives, or any other claimant who employed them : but of which Rives and his agent was not apprized, further than the opinion intimated, that Turner's lien on the deed of trust would postpone Rives' execution. Shortly after they were employed, they filed a bill in Chancery for him and others, against said Jones, and those who claimed under him, for the purpose of subjecting the negroes to the payment of the debt, supposing the deed from Harris to Turner and others, to have conveyed the legal title in said negroes to the trustee in said deed. Sometime after filing this bill, the validity of said deed of trust became doubtful, on account of the authentication being defective, or supposed to be so. In

that state of things, said Kelly and Hutchinson, as counsel for said Turner, procured a judgement at law, by confession, against said Egbert Harris, at the July term, 1822, of the Madison County Court, for the sum of $10,386 93 debt, $14 62½ costs; and as there were numerous judgements against said Harris, in which executions had not been levied, they to k out execution on Turner's judgement, and on the 18th day of August, 1822, pu: it into the sheriff's hands, with the intention of giving it the preference and with directions to levy it on said negroes, but not to take them into possession, or sell them, without further order. On the 20th day of December, of that year, the levy was made by the sheriff, by taking a list of the names of the negroes; but the negroes left in possession of those in whose hands they were found by the sheriff, and the said execution returned to the clerk's office, at the January term of said County Court. On the 21st of December, 1822, said Kelly and Hutchinson had said Rives' execution issued and put into the hands of said sheriff, returnable to the next spring term of said Circuit Court, with directions to levy it also on said negroes; which was done accordingly. On the 24th of January, 1823, a *venditioni exponas* issued in favour of said Turner, upon said levy and return, after which event a compromise took place between said Kelly and Hutchinson on behalf of their several clients, and the counsel of said Jones, and the plaintiff in the judgement, injoined as aforesaid by said Turner, by which, after satisfying said last mentioned judgements in negroes at valuation, the remainder of the negroes were given up to the other creditors. In consequence of this compromise, the proceedings in Chancery, in favor of said Turner, and said Rives and others, were dismissed, and Turner's injunction dissolved. The residue of said negroes were sold under both Turner's and Rives' executions, but did not amount to enough to satisfy Turner's.

It is also agreed, that Simon Turner is to be considered a party, although it is strictly a motion against the sheriff alone; and that either Rives or Turner may appeal, or sue out a writ of error."

I have copied the case agreed, as it is difficult to compress the statement of facts satisfactorily. The Circuit Court adjudged that the money in the sheriff's hands, or so much of it as would satisfy Rives' execution, should be paid to him. Turner and M'Broom have sued out

their writ of error.   The assignments made cover the
whole case.

                                   M'Broom and
                                    Turner
                                       v.
                                    Rives.

   The case naturally presents two points :

   First, Whether a *fi. fa.* returned *nulla bona*, has any,
and what effect on the property of the defendant, upon
suing out an *alias fi. fa.* after a term has intervened be-
tween the return of the first, and the issuance of the se-
cond?

   Second, Do the facts in this cause present any evi-
dence of actual or constructive fraud on the part of
Turner?

   A third point has been made by the defendant in error,
viz : That the legal title to the negroes was, by the deed
of trust, vested in the trustee, and although the deed
might be void, as to third persons for the defect in its au-
thentication, it was in full force between the parties, and
no execution sued out on behalf of the *cestui que trust*
on a judgement at law, for the debt, intended to be se-
cured by the deed, could be levied on the property con-
veyed by it.

   The first question turns entirely on the construction of
the 8th section of the act of 1806, entitled " an act con-
cerning executions, and for the relief of insolvent debt-
ors." [a] The first clause of which is in these words : " That  [a] Laws Ala. 294.
no writ of *fieri facias*, or other writ of execution, shall
bind the property of the goods, against which such writ
is sued forth, but from the time that such writ shall be
delivered to the sheriff, under sheriff, coroner, or other
officer, to be executed ; and for the better manifestation of
the said time, such sheriff, coroner, or other officer, his
deputy or agent, shall upon the receipt of any such writ,
without fee for doing the same, endorse upon the back
thereof, the day of the month, and the year when he re-
ceived the same." &c.

   At common law, an execution bound goods from the
teste.   By the statute, it is provided that such lien shall
exist only from the time the execution is placed in the
hands of the sheriff, who is required to endorse it, that
the time may more clearly appear.   This change of the
law has been adopted not only in England, (whence we
derive the foundation of almost the whole superstructure
of our jurisprudence,) but in a great majority of the states
of this union.   In forming a conclusion on this subject,
we have the aid of great and learned men, of both hemi-
spheres.

JANUARY 1827.

M'Broom and
Turner
v.
Rives.

It seems that before the common law was altered, "men abused the notion of the retrospect of the goods being bound by the teste of the writ, to make sales uncertain ; for they took out writs, one under the other, without delivering them to the sheriff, by which they bound the goods of their debtors, and consequently made sales and commerce uncertain." If this were the true reason, and certainly every probability is in its favor, the object of the statute was not so much to aid judgement creditors, as to remedy abuses which they sometimes committed, and to compel plaintiffs to use the means which the law had given them to obtain satisfaction of their judgements, or to lose their right of preference. It is admitted on all hands, that the statute is plain in its requirements as to first executions. As to these, the decisions have every where been uniform, and no fictions of the Courts have been resorted to, nor ghosts conjured up to prove, that leaving them in the clerk's office, or entering them on the rolls of the Court, would be placing them in the sheriff's hands. But it is contended, that although this first writ is upon its return day, *functus officio*, and so remains until an alias issues, yet so soon as this is done, the first execution regains so much of its life as enables it to take within its grasp, all the property the defendant may have obtained by bequest, purchase, or otherwise, during the years while it has been lying silent in the tomb : no matter how long, or how honestly such property may have been disposed of by the defendant, even in payment of other debts. If the sages of the law have so construed this statute, however much my opinion might be opposed to theirs, I would yield to such authority. The statute in terms certainly makes no distinction ; its words are " no writ of *fieri facias* shall bind goods," &c. The obligatory force therefore, could not be in an alias by retrospect, but must be in the first execution by the prospective operation given to it by suing out the alias. Would this construction remedy the mischief produced by the common law ? It appears that at common law, men took out writs, one under the other, without delivering to the sheriff, and that this had the effect of rendering sales and commerce uncertain, and for this reason, required the interposition of the Legislature. If the statute receives the construction contended for, sales and commerce, instead of being more, would be less certain. If the position taken by the counsel for the defen-

dant in error, could be sustained. his industry and ability
would have enabled him to produce cases in which the
English Courts had given such effect to alias executions.
But none such have been produced. And it is by consi-
dering an execution, which dies at its return day, as endued
with the qualities of a contract, by which one gives to
another a lien on his property to secure a debt; and
which continues in full operation, until the debt is paid,
that the counsel for the defendant attempts to sustain
himself. But an execution, after its return day, cannot
be levied, although it is obvious that no part of the
judgement has been made. The execution contains on
itself, evidence of its failure to effect its object. The
sheriff may have the execution in his possession unsatis-
fied : the property of the defendant may pass before his
eyes, and yet he cannot levy on it. But a lien by contract,
a deed of trust, or mortgage, continues in operation
until it is satisfied.

The case of Edwards against Harben,[a] does not, as it [a] 2 D. & East. R.<br>587.
is believed, sustain the points to which it was cited. The
case of Brown against Gilliland, cited from 5 Desaus-
sure, gives all the effect to an execution which has been
returned : which is contended for by the counsel for the
defendant. But the effect of this decision is much weaken-
ed by its being a reversal of a decree of Judge Thompson,
known to be one of the ablest Judges of South Carolina;
who, in the emphatic language of his decree, says, that
he considers an execution returned " *nulla bona,*" pre-
cisely as if it had never existed. The cases of Tabb
against Harris, and Daniel against Cockrill, administra-
tor, reported in 4 Bibb, and Epps against Randolph, in
2 Call. sustain a directly contrary doctrine ; and it is be-
lieved that all the other cases, which bear directly on the
point, go to sustain these authorities.

Upon the best consideration therefore, which I can be-
stow on this subject, my conclusion is, that suing out an
alias execution, and delivering it to the sheriff, can have
no effect in continuing a lien of a prior execution which
has been returned. Nor do I apprehend any evil conse-
quences from this, as it can never be material, which of
two bona fide creditors recovers his debt. But a majority
of the Court are not satisfied to go thus far. It is the
opinion of the majority, that where there is negligence in
the plaintiff in not regularly suing out his execution
from term to term, an execution on a younger judgement,

JANUARY 1827.

M'Broom and
Turner
v.
Rives.

placed in the sheriff's hands. during the time the plaintiff was guilty of such negligence, will be preferred to his.

On the second point there can be but little difficulty. I cannot perceive the slighest reason for charging actual fraud. After Kelly and Hutchinson were employed, every necessary act on beh lf both of Turner and of Rives, appears to have been performed by them ; they were honestly pursuing Turner's rights, when the agent of Rives first called upon them. They distinctly informed him of their situation, of the duties they owed to Turner, and of their belief that his debt would have a preference ; yet he chose to employ them. When they afterwards discovered that Turner's deed (the flaw in the authentication of which they had overlooked) was defective, and probably void, at least, as to third persons, it was their duty to use some means by which he might, if possible, be placed in as good a situation as when he confided his business to them. They had advised him that his deed was good, and his recovery certain. Had they then informed him that he must resort to his legal remedy, he might before this have had his judgement. To repair as much as possible the effect of their own error, they immediately obtain a confession of judgement from Harris in favor of Turner, and sue out execution thereon. There is no intimation in the agreed case, that Rives considered Turner's deed of trust to be fraudulent; it was at last abandoned, not because it was without consideration, or for any other reason affecting the honesty of the transaction. but for an unfortunate omission, not at all affecting the justice of the case. It is believed that there is abundant evidence of the sufficiency of the consideration for the judgement that was confessed; nor is there any fraud in the sheriff's being directed to leave the negroes in the hands of the persons who had them in possession. It could not be intended to favor the defendant to the execution : he had no control over them. They were held by persons who claimed title. Turner might in good faith, prefer to levy on them to secure as far as possible a preference, and fear the responsibility which would be incurred by taking them from the possession of those who then held them. It may have been his object to endeavor to force a compromise, and in this way, the return of the execution before the sale, may also be rationally accounted for. After the levy, the property was vested in the sheriff, and there continued until the sale under the *venditioni exponas*.

Nor was there any constructive fraud; at all events, none as to Rives. The injunction obtained by Turner was not for a feigned purpose, and even if those included within its mandate might have complained, Rives was not injoined, but left free to sue out his execution as he might think proper. A constructive fraud is an act which the law declares to be fraudulent, without inquiring into its motive; not because arbitrary rules on this subject have been laid down, but because certain acts carry in themselves an irresistible evidence of fraud. The instances given in the books are few, and I feel no disposition to enlarge the number. The law has placed such guards against fraud, that those who attempt it, rarely succeed. The intention to commit it must be proved. These are exceptions to the rule, let them remain as exceptions. In this case however, no other conclusion can possibly be arrived at, but that the property was levied on by Rives' execution, and in every respect. left in the same situation that it was under Turner's, excepting that the return day of the other not having arrived, no *venditioni exponas* was sued out.

<div style="margin: margin note">JANUARY 1827.</div>

<div style="margin note">M'Broom and Turner v. Rives.</div>

The last point presented has, I acknowledge, produced with me some difficulty. It is certainly a rule of law, that conveyances which are void as to third persons, may yet be good between the parties. [a] But in the case cited from Johnson's Reports, where an execution issued on a judgement obtained by the mortgagee, was levied on the mortgaged premises, which were sold by virtue of it, seems clearly to meet this. A deed of trust can operate only as a mortgage, until the trustee carries his power into execution by a sale. The bargainor beyond a doubt, has a right to redeem, by paying the amount of the debt intended to be secured. at any time before the sale. This interest has frequently been determined to be a legal estate, so far at least, as to be liable to execution. But it might be a sufficient answer to say, the *cestui que trust* has a right to proceed at law, and in Chancery at the same time.

[a] Robt's. Fr. Con 641, &c.

It is the opinion of a majority of the Court, that the judgement of the Court below should be reversed, and that Turner's execution should be first satisfied.

## JUDGE CRENSHAW.

As to Turner's equitable security under the deed of

JANUARY 1827.

M'Broom and
Turner
v.
Rives.

trust, if available at all, he abandoned it, (on account of some defect in the deed,) by taking a confession of judgement from Harris, and proceeding under an execution thereon, to sell the property. The lien which Turner may have had under the deed of trust is, therefore, foreign to the present inquiry. I deem many of the points made in the argument, in relation to fraud, equally so. For in my opinion, the record furnishes no ground to infer fraud, actual or constructive, and having any bearing on the main question now presented.

To come directly to the point which I conceive to be presented for consideration. I hold that an execution, from the time it is delivered to the sheriff, acquires a lien on the personal chattels of the defendant, which is continued as long as the execution is kept alive by renewals; that after an execution is returned, it loses its active energy, but does not lose its binding efficacy on the defendant's property; that priority must always be given to the elder execution, if its lien has been so kept alive, although the money has been made by levy and sale under a younger execution. This is clearly the doctrine of the common law, sustained by judicial decisions, of great respectability in some of the states of the Union. It has been so settled in South Carolina, and the decisions in New-York are not to the contrary; and indeed I never before heard this doctrine controverted in a court of justice. The able arguments of the counsel, who contended against it in this case, did at first compel me to hesitate; but on reflection, I am constrained to adhere to the principles which I have always heretofore considered as the law of the country. The only authorities cited, which are directly against this doctrine, are from Virginia and Kentucky. For the Judiciary of these States, I have the highest respect. But authorities from one or two States, should not govern us, in opposition to the well established principles of the common law, which, so far as consistent with our local institutions and peculiar form of government is, as I understand, the law of this State. To know correctly what is the common law, while we do not disparage the judicial decisions made in our sister States, we ought also to resort to the decisions of the eminent tribunals of that country, from which we have derived the common law. A recurrence to these decisions will shew that my opinion is well supported. Rives' execution was older than Tur-

ner's. Its lien had been kept alive by one renewal, and in my opinion, the money made under Turner's younger execution, should be applied first to the satisfaction of the execution in behalf of Rives.

HITCHCOCK and THORNTON, for plaintiffs.

M'KINLEY and HOPKINS, for defendant in error.

The CHIEF JUSTICE absent.